[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs, John M. Scalesse and Samuel Piccione, Jr., have filed this action seeking, inter alia, 1) a declaratory judgment declaring a release of a mortgage from the defendant Liberty Properties Associates Limited Partnership to the plaintiffs to be null and void, 2) foreclosure of the mortgage, 3) a deficiency judgment, and 4) money damages for default on the notes secured by the mortgage (Plaintiffs' Second Amended Complaint, October 9, 1991).
Defendant Liberty Properties Associates Limited Partnership ("LPA"), Liberty Properties Ltd., Paul Limone, Eugene O'Neill, New Destiny Development Corp., Robert J. Mauceri, Trustee, and James G. Holder, Jr., Trustee, have filed a variety of special defenses, including, as their seventh special defense, that the mortgage at issue was released by the plaintiffs.
This case has been consolidated with a related case, John M. Scalesse et al v. Charles Scalesse, Esq., Docket No. 276686, in which the plaintiffs allege professional negligence by the defendant lawyer as to his role in the preparation of a release of the mortgage and the delivery of that release to LPA.
The court bifurcated trial of the issues in Docket No. 252922 and heard as a preliminary (and potentially dispositive) issue, the issue of the validity of the release of the mortgage. Post-trial briefs were filed on November 30, 1992.
The court finds the facts to be as follows. On September 1, 1983, plaintiffs Samuel Piccione, Jr. and John Scalesse, along with Richard Scalesse, purchased for $2,025,000 properties known as 148-156 Temple Street and 158-166 Temple Street in New Haven. The seller was Samuel Heyman. One of the tenants in one of these office buildings was New England Associates, the insurance business of plaintiffs John Scalesse and Richard Scalesse. In 1983, Samuel Piccione was selling insurance as an independent contractor for New England Associates. CT Page 2695
John Scalesse is the uncle of Richard Scalesse.
In order to buy the buildings, the plaintiffs and Richard Scalesse borrowed $225,000 from New Haven Savings Bank. As part of the purchase, the plaintiff and Richard Scalesse executed two promissory notes in favor of the seller, one note in the amount of $1,350,000, and the other in the amount of $450,000. Both notes were secured by a mortgage on the properties. Though the three men had formed a partnership known as Scalesse, Scalesse and Piccione, or "SSP", Heyman insisted that the notes and mortgage be their individual obligations, not partnership obligations.
The plaintiffs and Richard Scalesse decided to syndicalize the properties and were advised by counsel that they could not be both the owners and the general partners. They sold the properties to a limited partnership, Liberty Properties Associates Limited Partnership ("LPA"), of which Paul Limone and Eugene O'Neill were the general partners. Limone was a business associate of John and Richard Scalesse; O'Neill was a customer of Richard Scalesse as to a large insurance account.
In consideration for the transfer of the properties, LPA executed two non-recourse promissory notes in favor of the plaintiffs and Richard Scalesse, in the amounts of $1.8 million and $225,000, respectively. The former note was secured by a purchase money wraparound mortgage executed by LPA. It does not appear that the $225,000 note was secured.
LPA experienced difficulties in managing the properties in a manner that would allow it to pay expenses, and in 1984 it was trying to sell them. In September 1984, LPA received from H M Enterprises an offer to purchase. In the fall of 1984, John and Richard Scalesse and Paul Limone accused Samuel Piccione, who was acting as rental agent for the properties, of stealing assets; and they had blamed him for botching a transaction with a major prospective tenant that had resulted in a suit against LPA. The three men were on adversarial terms when they met on December 6, 1984 in the office of Charles Scalesse, a brother of Richard Scalesse who was an attorney with an office in one of the buildings at issue.
Though the testimony on this point is in dispute, the court finds that the purpose of the meeting was to sign a release of the LPA wraparound mortgage that was needed for the sale of the CT Page 2696 properties by LPA to H M Enterprises. The meeting was very brief. Piccione testified that he asked Attorney Charles Scalesse, in a private conference out of the hearing of Richard and John, what the release would accomplish, and that he was told it would serve to relinquish a differential in rates between the mortgage to Heyman and the mortgage from LPA and that the release was necessary to complete the impending sale.
The plaintiffs and Richard Scalesse signed the release and gave it to Attorney Scalesse. The court finds that no explicit instructions were given to Attorney Scalesse that the release be used only with regard to the sale to H M Enterprises, but that it was implicit that this sale was the reason for the release and that the plaintiffs left Attorney Scalesse's office with no expectation that the release would be provided to LPA except for that impending sale.
The sale by LPA to H M Enterprises did not occur, and LPA was increasingly unable to meet its obligations and operate the building. Richard Scalesse, who had urged some of his relatives and insurance customers to buy limited partnership interests in LPA, was hearing of their dissatisfaction at calls for funds to meet obligations. Richard LoRicco, who had become interested in the properties while representing a prospective tenant suing LPA, proposed to buy two shares of the disgruntled limited partners and provide resources if LPA could obtain a release of the wraparound mortgage. At the scheduled closing, LoRicco refused to close because he had discovered that the wraparound mortgage had not been released. While Mr. LoRicco testified that his interest in such a release was prompted by his view that the interest differential between that mortgage and the plaintiffs' mortgage to Heyman was "exorbitant", it is unclear why a release from the entire mortgage, rather than a revision, was sought. Rather, it appears that LoRicco in fact pressed Richard Scalesse for release of the entire mortgage as a condition for bailing out LPA.
Richard Scalesse's business associate, Paul Limone, and his customer, Eugene O'Neill, had been recruited by him to serve as the general partners of LPA even though they had little or no experience in such a role; and Richard Scalesse had urged his other valued insurance customers to buy limited partnership interests. In he was not able to help bail out LPA, he would not only face personal liability on the notes he had signed to Heyman and the Bank of New Haven, but he would also suffer the likely CT Page 2697 loss of some significant insurance clients in the business from which he was making his living.
Richard asked his brother Charles for the release that had been signed by him and the plaintiffs in 1984 and caused it to be delivered to Attorney Beck, counsel for LPA in the transaction with LoRicco. At Charles' urging, Richard put the request in writing in a letter dated September 24, 1985, in which he represented to his brother that he was making the request for delivery of the release "on behalf of Scalesse, Scalesse and Piccione, a partnership" and that the general partners of LPA were also making the request. (Ex. 6). Before turning over the release, Charles did nothing to ascertain whether his uncle John (whom he knew was feuding with Richard as to the insurance business) or Piccione (who had moved to New Jersey after being fired and accused of a crime by Richard and John) agreed with the furnishing of the release of the mortgage to LPA without a sale of the properties. Richard did not indicate to Charles or to any representative of LPA that he had obtained the approval of the other two mortgagees on the wraparound mortgage to supply the release, nor did he solicit such approval from either his uncle or Piccione before turning over the release of the wraparound mortgage at the rescheduled closing with LoRicco. The court finds that Charles Scalesse's insistence that he receive a written request for the release was the result of his knowledge that, under the circumstances, Richard did not have authority to act for the plaintiffs.
In connection with his transaction with LPA, LoRicco executed a memorandum dated October 10, 1985, addressed to Paul Limone, c/o Liberty Properties Associates Limited Partnership, indicating that "I have been advised a) that the release being filed by the wraparound mortgage holder was executed on 11/11/83 [sic]; and b) was held in escrow by Charles Scalesse, Esq. to date hereof. Said release shall be released from escrow and filed upon the New Haven land records."
The court finds that the creation of this memorandum indicates that the validity of the release was an issue in the LPA-LoRicco transaction, and that, despite Limone's assurances that the release was meant to have been effective as of its signing, Lo Ricco was doubtful about this representation since the executed release had not been given to LPA or recorded at the time it was executed. CT Page 2698
The court finds that LoRicco's reservations were well grounded. Limone, as general partner of LPA, admitted that, at the time, he was feeling "desperate," and that the plaintiffs and Richard Scalesse were "ready to kill each other". (Tr., p. 270).
The court further finds that even if Limone believed the decision to release the mortgage was one that was to be made by the Scalesse, Scalesse and Piccione partnership rather than by the three men as individuals, Richard's relationships with his uncle and Piccione were so strained that it was unlikely that he was authorized to act on their behalf in taking a step which would remove the security from their loan to LPA even though they remained individually obligated to New Haven Savings Bank for $225,000 and to Samuel Heyman for nearly $1.8 million. Once the release was recorded, the plaintiffs and Richard Scalesse continued to hold LPA's notes, however the notes were unsecured as of the date of filing of the release, and LPA was having great difficulty meeting its obligations.
The Release
The court's inquiry begins with analysis of the transaction which resulted in the filing of the release of LPA's mortgage obligation to the plaintiffs and Richard Scalesse. Generally, the furnishing of a release is in exchange for performance of some kind by the party released. Typically, of course, a mortgage is released because the indebtedness which it secures has been satisfied. See 49-13 C.G.S., which provides for the entry of a judgment that a mortgage is invalid where a mortgagor proves payment of the indebtedness.
The defendants assert that the plaintiffs have admitted the validity of the release of the mortgage in their initial complaint. The defendants cite paragraph 16 of the Second Count of the complaint dated November 25, 1986. That paragraph states that the defendants "caused to be filed upon the land records of the Town of New Haven a Release discharging the mortgage that had previously been filed to secure the obligation of Liberty to the plaintiffs." Superseded pleadings are evidential, not judicial admissions. Dreier v. Upjohn Co., 196 Conn. 242, 244 (1985). While Dreier, supra, indicates that superseded pleadings are admissible in evidence, the defendants did not, in fact, either present them in evidence or request that judicial notice be taken of the superseded pleadings. Since a party against whom evidence is offered must have an opportunity to respond, State v. Lenihan, CT Page 2699151 Conn. 552, 555 (1964), the court may not consider claimed admissions not actually offered into evidence at trial. Even if this were not the case, the court can hardly read the cited allegation as an acknowledgment of the validity of the release when the next paragraph alleges that the release was "converted. . .without right or authority."
A release of the mortgage from LPA to the plaintiffs and Richard Scalesse was recorded without the indebtedness having been paid and in the absence of any contract between those parties that obligated the mortgagees to furnish the release. In other contexts, it has been held that if there is no mutual assent to the release, the release is not valid. Griffin v. Nationwide Moving and Storage Co., 187 Conn. 405, 414 (1982); DiUlio v. Goulet, 2 Conn. App. 701, 704 (1984). In the case presented here, in October 1985 there was simply no transaction in progress between LPA and the plaintiffs. Richard Scalesse was gratuitously and unilaterally supplying LPA with a release of the wraparound mortgage without receiving any consideration from LPA in return. Though he and the plaintiffs would be more likely to receive funds from LPA if LoRicco infused some cash into that entity, LPA was already obligated to pay its notes to the plaintiffs and Richard Scalesse, and they received no new consideration. Clearly, when Richard Scalesse obtained and provided LPA with the release he did so in the belief that he and the plaintiffs would benefit if LPA were able to satisfy LoRicco's condition for becoming a limited partner and advancing money to LPA. There is no evidence, however, that he ever presented this perceived benefit to the plaintiffs, and the court concludes that he unilaterally decided to provide LPA with the release, which had been held in escrow since the expected sale had failed in early 1985.
The plaintiffs claim that Richard Scalesse was not authorized to provide the release. He claims that he had general authority as a partner of Scalesse, Scalesse and Piccione, however the plaintiffs claim that the partnership did not extend to transactions concerning the notes and mortgage relating to the purchase of and sale to LPA of the Temple street properties. While no written partnership apparently exists, the court finds that, at least until December 1984, the plaintiffs and Richard Scalesse were partners in a partnership known as Scalesse, Scalesse and Piccione, formed to develop the Temple street properties. The notes and wraparound mortgage from LPA identify the obligees as the three men individually, not the partnership. CT Page 2700 Payment on the mortgages received from LPA were deposited into the partnership account, and payments were issued by the partnership to pay the obligations undertaken by the three partners in acquiring these properties (Ex. O, P, Q). The court does not find credible the plaintiffs' suggestion that the partnership was formed for the limited purpose of managing the Temple Street properties after the sale to LPA.
The Uniform Partnership Act, 34-39 C.G.S. et seq., adopted by the General Assembly in 1961, provides, at 34-47(1) C.G.S. that "every partner is an agent of the partnership for the purpose of its business, and the act of every partner. . .for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority." [emphasis supplied].
Section 34-47(2) C.G.S. provides that "[a]n act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way, does not bind the partnership unless authorized by the other partners." [emphasis supplied]. The release at issue was prepared in the context of a sale that would wipe out the plaintiffs' obligations. It was not "the usual way" of the partnership's business for a release prepared for a specific event to be applied to an entirely different situation, in which the plaintiffs would remain liable but would give up their security from the party on which they depended for the means to satisfy those liabilities.
The court finds that Richard Scalesse had no authority to release LPA from the wraparound mortgage at the time he did so. The release was signed by the other partners in the very different context of an impending sale in which their obligations to Samuel Heyman and New Haven Savings Bank would be satisfied. The plaintiffs were never asked to supply LPA with a release independent of any sale, or to gratuitously release the mortgage, such that they would become unsecured creditors of this limited partnership. No evidence was presented to suggest that they had ever assented to an unconditional release of the mortgage, nor that Richard Scalesse or his brother, as the attorney for the partnership, ever secured the actual consent of the plaintiffs to the filing of the release. CT Page 2701
The court further finds that Paul Limone, general partner of LPA, knew that Richard Scalesse had fired and helped to initiate criminal prosecution against Piccione and was estranged from John Scalesse at the time the release was delivered to LPA, and that the plaintiffs and Richard Scalesse were virtually at each other's throats at the time LoRicco made the release a condition of his purchase of the limited partnership shares.
Limone's testimony at trial was unconvincing. At first he professed to believe that the LPA mortgage was actually released in toto as soon as the release was executed, even though it was never delivered to LPA. He later took the position that all that had been released was the interest differential, even though no such limitation was contained in the text of the release provided by Richard Scalesse to LPA's attorney at the LoRicco closing.
Limone knew that LoRicco had refused to close at the scheduled closing because the land records had not included a release of the wraparound mortgage. He also knew that Charles Scalesse thought delivery of the release was sufficiently questionable that he had requested that both his brother and Limone sign a written request.
At the rescheduled closing, LPA obtained from LoRicco a document acknowledging that he knew that the release was not prepared in connection with his transaction but that it had been held in escrow. The creation of this document, which was marked "approved" by Limone, leads the court to conclude that LPA, through Limone, knew that Richard Scalesse was without authority to furnish the release, that the release was not signed in the partnership name but by three individuals, and that, if approached, Piccione and John Scalesse were unlikely to consent to the release. Therefore, rather than attempting to obtain a new release for the transaction at hand or requiring Richard to get actual consent to use the old release for this very different transaction, LPA sought to cover the hazards of the situation by getting a statement from LoRicco that he knew facts that should have suggested to him that the validity of the release might be contested. LoRicco testified that he knew from his discussions with Limone and Richard Scalesse that the plaintiffs and Richard Scalesse weren't getting along and that Richard was "siding with" LPA. Limone clearly had the same knowledge that Richard Scalesse was supplying what LoRicco wanted without any authority from the plaintiffs, who were known by Limone to have executed the release for the purpose of an impending sale. CT Page 2702
The court concludes that LPA was amply aware that Richard Scalesse had no authority to act for the plaintiffs in delivering the release of the wraparound mortgage.
Having found that delivery of the release was not within Richard Scalesse's general authority as a partner, that he had no specific authority from the plaintiffs and that LPA, through its general partner, knew this to be so, the court finds the delivery of the release to be void pursuant to 34-47 C.G.S. Where a deed is prepared and signed, the validity of the transfer of property when recorded in the land records depends on whether there was an intent to pass title. Lomartina v. Lomartina, 159 Conn. 558, 561
(1970); City National Bank v. Morrissey, 97 Conn. 480, 483
(1922); and upon whether the grantor intended that the deed be delivered to the grantee. Lomartina, supra, at 562. The same principles would seem to apply to other documents relating to interests in property that are recorded on the land records.
The plaintiffs have established that neither at the time they signed the release of the wraparound mortgage nor at any time thereafter did they agree or authorize Richard Scalesse to agree to release LPA from this transaction except in the context of a sale that would release them of liability on their loans to New Haven Savings Bank and Samuel Hegman.
Without authority to do so, Richard Scalesse delivered a release that his partners did not intend to be delivered, to a party that knew he lacked authority to do so. Conclusion
The release is invalid.
Because the obligations of the plaintiffs and Richard Scalesse to Samuel Heyman have been discharged as a result of a subsequent foreclosure, and because the wrap mortgage did not apply to the $225,000 note, it does not appear that the mortgage can be reinstated.
It also appears unlikely that the plaintiff can establish that any damages resulted from the unauthorized filing of the mortgage, unless the mortgagees on the wrap were in a position to redeem in the Heyman foreclosure action, however, the plaintiffs will have an opportunity to prove such claims at a trial of all remaining issues in this case and/or John M. Scalesse, et al v. CT Page 2703 Charles Scalesse, Esq., Docket No. 276687, on May 7, 1993 at 10:00 a.m.
Beverly J. Hodgson Judge of the Superior Court